Good morning, Your Honors. May it please the Court, my name is Michael Kuznetsky, and I represent appellants Noelia Lorenzo Monge and Jorge Reynoso. I'll try to save four minutes for rebuttal and further questions from the Court. Knowing that the Court is familiar with the briefs in this matter, I would like to address the first and fourth fair use factors as highlighted by a single fact and evidence, and that's the fact that the publication took place over two years after the secret wedding took place. Now, this can be interpreted in one of two ways. The first interpretation is that this was not a newsworthy event, but instead the publishers bootstrapped newsworthiness by making a news event out of their first publication of the photographs. Well, Counsel, I'm a little confused by that statement. Your clients had repeatedly stated that they weren't married. They are public figures. They are newsworthy. They're in the equivalent of the tabloids that we have in, these are Spanish tabloids. They repeatedly denied that. Here you have 400 pictures that are sold to Maya by a known paparazzo who has an interest in them, tells them that they're okay to use. They look at these 400, and I'm interested in your view on this. It seems to me that these are all copyrightable. They were only five that were ultimately registered, but they're all copyrightable. And they choose five photographs, actually six, I think, but five that were registered, to refute, this out there by these public figures. Why is that not a newsworthy event that is, in quotes, transformational? Your clients tell one story. The magazine tells another story. The Seventh Circuit's adopted that approach in this prong. What's the matter with that approach? If I may, I'd like to correct one thing that Your Honor stated, is that there's no evidence in record that the couple denied the marriage. The only evidence on that account is a statement within the publication itself that said that the couple failed to confirm the marriage. So there's no evidence. Wait a minute. Wait a minute. Reynoso said that his mother was furious at him because he had repeatedly lied to her to say he wasn't married. You find out that her son got married because she looked at a tabloid magazine. That's evidence of a lie, is it not? Even not just the mother in this case. The evidence is that the couple kept the wedding secret. The one incident that you're referring to is a brief phone call from his mother that said, did you get married? No, Mom, I didn't. I'm holding the magazine. Yes, you did. So other than that, yes, there is that one. The point is, was there ever a public denial? A public denial, no. There's no evidence of a public denial. Just evidence that they kept it secret and that they failed to confirm it. And the Supreme Court in Harper and Roe specifically indicated that there's no public figure exception to copyright infringement. And when dealing with news reporting, the issue is not what constitute news, but whether a news story is a fair use defense to copyright infringement. And here, again, there's no evidence in the record of denials or that this was a news story at all. Well, let's just assume it was just for talking purposes. That still doesn't answer the question fully, is that right? Which question would that be? Of whether or not that this is subject to copyright. Let's just say that it is newsworthy. But simply because something is newsworthy doesn't mean that you can take somebody's material and use it in your publication necessarily. It depends on the factors, the fair use factors, correct? That is correct. And even if this was So the question I have then really goes to these photos. Now, by and large, they were taken in toto. So they need to rely on the idea that some cropping and the headlines were transformative in some way. What is your view on that? Well, there's a couple issues on that. The first is that the headlines themselves and the captions don't necessarily make the photos transformative. What about the Nunez case from the First Circuit? Doesn't that treat it as being transformative? The Nunez case is distinguishable in the fact that in that case, the photographs themselves were the issue of controversy. The issue in Nunez was that, are these photographs appropriate for someone of the Miss Puerto Rico Universe position? And how can we talk about whether these photographs are appropriate or not without me showing you the photographs? In this case, the story I don't read it that way. Why don't you read the Geese case? Admittedly, it's a District Court case in the Southern District of New York, but that clearly isn't the same kind  I'm not familiar with that. This is the issue of transformation. And it seems to me those two cases make it clear that if you have something that is false and you take a picture and it's cropped and there are headlines around that dispute something that's out there that's not correct or that people think is not correct, that that can be transformative. Whether you agree with those cases or not, do you agree that that's what they found? That the first element of the four-part test of the statute was satisfied by the facts of those cases and that it may be analogous to this case? I'm not familiar with the New York decision you mentioned, but in the Nunez case, yes, they found that it was a transformative use. And in that case, there wasn't even a, the only lie was you had a woman who was, I think it was Miss Puerto Rico or something like that, she was running or whatever and here is the context. And the court found that was transformative when those were published with captions around and so on. Why isn't this, where there's a clear repeated emphasis by actions and certainly to the mother words that this couple was not married, probably made them more marketable, kind of a Donnie and Marie approach to the world. Well I agree with your last statement there that it did make the photographs more marketable, which goes to the fourth fair use factor, the effect on the market. However, as to the transformative nature in Nunez, they specifically found that they transformed about the public concern over the issue. Well as you said there, the question was, were the photos themselves the story? But in a way, Nunez doesn't really decide this case. I mean, this case is a different case. I agree. This case is unique in the fact that the photographs were unpublished. And the only real precedent on the matter is Harper and Rowe. The Nunez court itself distinguished itself from Harper and Rowe by noting that the photographs in this case were not unpublished like the manuscript in Harper and Rowe. In addition, in the Elvis Presley Enterprises case, this circuit held that headlines are not necessarily a transformative, excuse me, voiceover is not necessarily a transformative use of the work. Do you have any case though, I get your reference to the Elvis Presley case, but do you have any cases that involve facts like these, where there had been a misrepresentation or lie, however you want to state it, in the public and a newspaper or magazine took some pictures, changed the photos by putting, you know, captions to show, here's the bodasicritas. Right out here you can see with your own eyes, it's just false. You have a case like that where the court said it was not transformative? No, I don't believe there's any case. So basically, even though my... Well, there's no case. There's no case. So I don't take the negative inference. Respectively, there's no case that really sits on these facts, is what you're saying. No, the closest analogous case to this is Harper and Rowe itself, in which the unpublished manuscript was published, and they said, hey, this is a new story. This is a work of a former U.S. president. People want to know this information. This is a hot news story. And the court found that it was not a transformative use because they used too much, which goes to the third fair use factor. Okay. I was going to ask you about that. Well, let me just go back to the transformative nature, and maybe that goes also to what they used. Of the wedding photos that are at issue, we're talking about five photos, wedding plus the time surrounding the wedding. Is that right? Yeah. They used every photograph of the wedding, which is three photographs. Three photos. And then almost all photographs of the wedding night. There was a couple, I believe, that were duplicative of each other. They didn't use all of them. But the three of the wedding night don't even evidence the wedding itself. You have one of Mr. Reynoso smoking a cigar, and you have one of Noelia laying on a bed showing her underpants. These were used on the cover of the magazine to entice further sales beyond the magazine's normal readership. And were these thumbnail, or were they used basically in total? They were, in essence, cropped. So I can't say they were used in their entirety, but it's kind of like the borders were cut off. It's what Harper and Row refers to as the heart of the work. And these were used on the, so two of the three photographs on the cover. But that's, in Harper and Row, though, you had an entire manuscript by the former president. The Supreme Court concluded that the only reason anybody would buy the book is because of this one little thing about what he was doing with Nixon that went to the heart of the work. And in this case, you've got 400 photographs that, based on at least the deposition testimony which was submitted in connection with the motion for summary judgment, are substantially of the same character as the ones that Mr. Reynoso had previously sold with his other wife, his earlier wife with Pilar. You know, vacations and things of that nature. Why are we treating this as one whole when, in fact, we've got a whole bunch of photos that they did not use, they intentionally did not use and presumably have some commercial value? Why is that not an important consideration in your analysis of Harper? Just to correct the Court on one issue. There's no testimony as to what the other photographs show. All we know is that they were private photographs based on the evidence. And of those people, those two people, right? At least based upon the woman's testimony. They were their personal photographs. Right. Of them. Yes. But essentially this goes to the third fair use factor, the quantity and quality. And this was in essence the heart of the work. Why? These were the only photographs. The heart of the work for purposes of the magazine article, but why is it the heart of the work for purposes of the 400 photographs? How do we know that in looking through these photographs there weren't, you know, 50 of them of this woman in a semi-disobedient state that would be just sensational? But they had nothing to do with this story. The editor and longtime employee of the publishers, Juan Garcia, testified that he looked at all the photographs and determined that these were the most marketable ones and he's the one that chose them. Because of the story. Because of the story, yes. Right. That's my point. Let me just step back. I wonder if we're just going in the wrong way when we're talking about copyright. This isn't a work. There's 400 assorted photographs. So it's not the Harper and Rose situation where you have a manuscript or a work. And as my understanding of the copyright law, you have, you know, each visual depiction can be an individual work. Do you have, is there any reason we should be looking at the 400 at all? And that's just a random photos that somebody took from them, correct? There's two ways that this could be looked at. One is they used six of 400 photographs. Correct. And the other is each photograph is an independently copyrightable work and they were copyrighted. And they, for each photograph, they used substantially the entire photograph. Where did the 400 come from? The 400 came from the couple's camera. Right. And essentially the, what the publishers decided is that the six that they chose to publish were the most, had the most value in their first publication. That this was the, and it went to their story. That was because it would tell the story of a lie. The other 400 wouldn't be relevant to whether there were any lies. True. Again, there's no evidence of a lie other than the brief discussion with his mother. Just that they failed to confirm the story. Indeed, there's nothing in the record that this was a matter of public concern. But going apart from that. Whether I agree with you or not, I have one other question I want to ask before we're taking you over your time. So I'm sure that my colleagues will treat you fairly. One of the things that the district judge here found was that there was no market because the parties had absolutely no intention to ever publish these. What does the law say about that? What role does it have? Is there any evidence in the record to the contrary? Clearly there's evidence saying that they never intended to publish them. It was private. What role does that play? You are correct in that they testified that they never intended to publish them. I will address your question in two points. Legally, the standard is that the market harm is presumed when it's commercially secure. Okay, it's a presumption, but it's not a fact. Correct. The facts in the record, I'm sorry, can you repeat your question? My point is, even if you're right about, and I know about that particular case, Ledbetter, even if it's a presumption, it's not a fact, and the only facts that are available in this case show that neither one of these people had any intention to ever publish these photographs of the wedding. So if that's true and there's nothing to say to the contrary, doesn't that, as the district court found out, and we're not bounded by the district court, but doesn't that say that there is no market? That overcomes the presumption because there's a fact that they're not, they have no intention to publish it. If I may, I would like to answer the question. First. Why don't you answer and then wrap up so we can hear from you. Okay. I'll answer the question. As far as the evidence and record goes, the publisher's own purchase of the magazine was dependent upon obtaining the first publication rights, which was important. But the couple themselves have a history of selling photographs of themselves for print publication, including to the publishers themselves, and indeed Mr. Reynoso did sell prior wedding photographs of himself. For which they contracted in advance. Correct. Now, the issue here is the unauthorized first publication. If I may, with a brief hypothetical, and then I'll rest here. But let's say, for example, the publishers didn't print every photograph, but they printed the story with, let's say, one photograph and a copy of the marriage certificate. The couple, as part of copyright, retained the right to change their mind and later market these photographs. The reason they testified to keep this, to keep it secret, was for personal and business reasons. Had the secret come out, these are savvy business people, they may have decided. They didn't say for business reasons. They said for personal reasons. They never intended to publish. If I may clarify, Noelia stated it was for personal reasons. Mr. Reynoso testified that it was for business reasons. He's the one who had sold photos of his previous wife, too, right? That's correct. Why don't you sit down? I think we have your point in mind. Okay. Thank you, Your Honor. Good morning. May it please the Court. Diego Bobadilla for the appellees, Maya Magazines and Maya Publishing Group, LLC. Your Honors, I think it is important to speak a little bit about the facts of this case in order for the Court to make its determination. May I just ask you a question first? You can assume that we know the facts because it's been briefed by both of you. However, this question is what I want to ask. Let's assume that there is a transformation in the form of deception of a celebrity which would make at least the three wedding pictures very important for the story, not just for the picture itself, but for the story. Let's assume that. How do you justify the other three? Can't we treat them individually? Is it possible that we could find fair use as to three of them, but not fair use as to the other three? Because they don't tell us anything about a wedding. They show two people in a bedroom. But that doesn't, these days, that doesn't prove anything. Respectfully, Your Honor, it actually, the whole story was about the photographs, the evidence of this wedding that the couple who were celebrities denied happened. So the magazine was required to publish every one of these five photographs. There are not a lot of photographs. They were required to publish? Are you sure they were? Well, there's no law that said they had to. Well, then they aren't required to. I think you have to be a little careful when you say they're required to. The fact of the matter is these people have a private camera. Somebody takes them. The magazine buys them. They say, Eureka, gold mine for us. They weren't required to publish them. No, there's no law that says they have to. No, they just decided, and the question is, did they violate the copyright? So did the three photos that were not of the wedding, what's the evidence that those had to do with the wedding? Well, Your Honor, the publisher's position is that all of the photographs were evidence of a secret wedding. All 400 photos? No, no, no. The five photographs that issue were evidence of a secret wedding. Okay. What is the evidence? Going back to Judge Richard, what's the evidence that the three photos had anything to do with the wedding? All of the evidence needed to be considered in its entirety, in total. Answer the question. What was the evidence that the three photos had to do with the wedding? Okay. Well, let me pull the pictures out specifically. Was there a date on them? No. Okay. There's no date. Was there a caption? Well, no. Before you put one, before your client put one. Right, no. Okay. But the evidence, however, is if we decide that the wedding bed, she's wearing the same clothes that she was wearing when she got married in front of the minister. That is evidence that that happened on the same day and that it was a wedding. Now, I know people don't usually go to bed the night before their wedding, but what if she wore those clothes the day before? What does that have to do with the wedding? Well, the testimony at that position was that it was her wedding night and that she did pose in this manner because it was a private moment between husband and wife. And I'm sure that it was. However, in being public figures and lying about their union, that converted it into a news story. The magazine had to publish the evidence that it had that what they said was false. Moreover, the magazine was entitled and the Copyright Act encourages them to comment, to criticize, and to report on the news. There was, the caption underneath that photograph is a bit tongue-in-cheek. How many photos were there of the wedding? That issue that we know about, there were six photographs. There were three of, how many of the wedding ceremonies? Oh, the wedding ceremony itself, one with the minister, one posed in front. That's a little. And one of the kiss, three. So three of the actual wedding and three other photos that were supposedly taken the same day? Well, that were undisputably taken the same day because the plaintiff so testified. Right. So one of the questions I have really is when you're looking at this kind of a case and you're looking at how much of the copyrighted material was taken, what relevance do the other 394 photos have? Well, the only relevance that I can perceive and in all candor to the court is showing for analysis of one of the factors is the magazine's good faith. There were other sensational photographs in that bunch. There was a video of Noelia getting dressed and she was half naked. The magazine didn't publish that picture because it wasn't probative of whether or not they got married. There were actually two videos, weren't there? There were actually two videos, yes, Your Honor. And they weren't probative of whether or not they got married. And moreover, they weren't evidence of that. And the only probative value of the three of the wedding night, as I've heard you say, is what she had on. Is that the only clue that it's probative? No, Your Honor. Well, if I picked up that magazine and looked at it and you hadn't published the three of the wedding, you just had published three people, three photos of two people in bed, that wouldn't tell me anything about a wedding, would it? Not alone. So the only thing, but you said the only thing that ties it to those other three is that she had the same clothing on. And you said that happened, had to be on the same day because look at her clothing. So I'm asking you, is that the only clue of probative value that ties it to the wedding is the clothes? That particular photograph, yes. However, I think the analysis should be on the entirety of the evidence. We're not required to make a point by showing only that evidence which is sufficient to make a point. Let me ask you this to follow up on Judge Brewster's question. As I understand the testimony of the editor, there were two, I know, the man and the woman. But the man, as I understood it, when you look at these photographs, he saw them sequentially and he picked out the ones out. There's no question that everybody testified these came from the computer of this couple, right? Correct. I think on a flash drive or a CD or whatever. So there's no question about that these pictures belong to them. So by his seeing these things, picking them out, even though it may not have shown up in TV notice, there is evidence in the record that shows that these were either directly sequential or semi-so, because they were part of a series and he picked them out. So for purposes of determining whether they were evidence of the wedding night, his testimony would have some bearing on that as well. And the couple, that these photos all came from their computer. And that they testified about who took the pictures, I think in the case of the wedding chapel, they said it was taken by employees of the wedding chapel. The other ones were taken by the two of them. They testified about that. That's part of the evidence. And they said what these were. So to me, it's important that we keep in mind that the photos are only part of the evidence. The circumstances in which they were viewed and the source of those is also a factor. Is it not? Yes, Your Honor. Just as the Nevada records, which counsel aptly states that the magazine could have proven its point using other evidence, that's true. But that's not the standard. The standard is to this story, the story about we found these photographs that proved that these people are lying, that story required the publication of every one of those photographs. So basically of the set related to the wedding, when we look under the fair use factors of how much you published, you published 100% of those. Absolutely. Fair to say. Okay. So really the 394 go by the wayside. That's not a basic comparison. So you published the, these were previously unpublished. You published 100%. They have a potential market. You wouldn't have bought them if you didn't think they had a potential market. They have a potential market for them as well. So are you left with saying, are you left really with whether it's newsworthy as your only fair use factor that you can rely on? No, Your Honor. First of all, let's go back. The fact that we used the six photographs that exist does not equate to us using 100% of everything for purposes of militating against fair use. And I'll explain why. First of all, normally in a wedding there aren't six pictures. There are 400 pictures. In fact, when the magazine pays people to take these photographs, they actually give us a professional photographer that works through the wedding, that gives us a lot of material for us to pick from, and then publish. That wasn't that case. This case was about these secret photographs taken by the couple, by staff, and by a waitress at a bar in Las Vegas. Now. With a bunch of other photos on the camera as well. With a bunch of other photos on the camera. So, I mean, let's, I mean, the problem with your argument is if you steal my iPad, and it's got a lot of stuff on here, and you decide to use four of my photos, because most people have a lot of photos, you use four of my photos, isn't the real question of each one of those is a copyrightable work? If you use all four of them, I don't think it's any defense to say, yeah, but she also had about a thousand other photos on there, and I didn't use those. So I'm not, do you have any case that would suggest that? No, no. I agree with that, Your Honor. What I'm saying is that the fact that we chose to publish all of the photographs doesn't weigh the factor against us. Why not? Because these were the photographs that were necessary for our news story. If there had been 400 photographs, we wouldn't have published all 400 of them. That's true, because we simply don't have the space for that. We would have picked them. But in this case, they were only these six, and they were probative. Why were they necessary? Well, go ahead. I'm here from Judge Brewster, and I want to go back to that under the copyright law, not under the news magazine law. You made the statement that all six were necessary to prove your story, that they were married. And I'm asking you, what's the basis for saying that the three that didn't show a wedding were necessary to prove a wedding? They were necessary to show that these, the magazine's statement, that these photographs prove the wedding. I can't say this photograph of Noelia on the bed proves the wedding without showing you the photograph. That's the story. Well, wouldn't you have made your point pretty good if you showed one picture showing him with the pastor standing there at the altar having a ceremony? She's holding a flower. Wouldn't that have proved your case? That would be the court supplanting its opinion on what is news and what is required to report it. Well, we have to decide. You told us we have to decide whether it's necessary. That's the clue. If it's necessary, you can do it. It's fair use. So I'm asking you, why are the three that don't suggest wedding, in fact, drawing the hard board, how come just one isn't necessary, the others are superfluous? Because the purpose of the article was to show the photographs that prove the wedding. We discovered evidence. Here is the evidence. That's the story. It's not generally, it is also, but it's not only generally that they were married when they said they weren't. It is also we found these pictures. Well, doesn't the doctrine of fair use require you to use as little as necessary to justify violating a copyright? Yes. Well, that's why I'm asking you, what's the necessity of anything more than one picture which shows them in front of the pastor getting married? What's the necessity? I know it would be a great picture, I mean, a great story. We don't disagree on that. I'm just saying since you have by law the obligation to use the minimum that's necessary to prove your story because it's a copyrighted material, then what's the justification for not let alone three, but even five? It's the extent of how probative the evidence is. But that's, you see, that's not standard in copyright. I mean, if you, you may decide, you have, you have those photos, and you may have to make a decision as a publication that you don't want to publish something that is going to put you in some kind of defamation case or some kind of other legal thing. So you've got these, and you say, look, we can back it up. We know they got married. But the copyright standard says what's basically the amount and the substantiality of the portion used. It doesn't say how much did you want to use to make your publication better or more interesting, which it was. So how do you respond to the actual copyright standard? The amount and substantiality, that doesn't say how much might have made it better. The Fair Use statute provides the exception for criticism, for comment, and for news reporting. All those things are overlapping. The magazine made a determination that the story that they wanted to tell was we found these photographs, plural. They show what they show, and what they show is that this couple was, in fact, married. If you look at it in total, you can see them before the priest. You can see them giving each other a kiss. You can even see them at a bar celebrating, and ultimately, you can even see them in bed. So how are they going to say they weren't married? The extent of how probative these photographs is can't be depicted without publishing them. Number two, Your Honors, we criticized and we commented. The magazine did these things, which are exceptions in the statute within the article. With respect to the picture on the nuptial bed, the magazine, tongue-in-cheek, says, Flirty, suggestive, and happy, as any bride on that day, the singer posed, ready for the wedding night. Now, the magazine is entitled to make a comment, and to invite criticism, and to fuel, and to engage in a public debate. That's what the Fair Use statute allows. Now, perhaps it isn't in great taste, and perhaps I know that the plaintiffs were offended, and that many people could be offended. I think we all agree that that's not the standard, though. But that's not the standard. The standard is whether or not they criticized, whether they commented, and whether they reported news. Can I ask one question here before we end your testimony? I'd be interested in your perspective on what impact, if any, the fact that your magazine got these pictures from someone who stole them from this couple? I'm sorry, who stole them? Your client bought pictures that the couple claims were stolen. Yes. The paparazzo came to your client. They knew he was a paparazzo. And the editor said, you know, I want you to sign this form, either a standard form that he used, in which the seller, the paparazzo, claimed these were his pictures, had every right to sell them. Now, it turns out, it may not have been true, they clearly have a case against the paparazzo for stealing them. But what impact, if any, does the fact that your client bought pictures that at least, according to the record, was a bona fide purchase for value have on this case? Well, actually, Your Honor, although it's emotionally charged, the argument, it really is a red herring. The fact of the matter is that the pictures are evidence, and whether we found them on a stoop, someone mailed them to us anonymously, or we purchased them from someone who was willing to sell them and sign a copyright assignment, they're evidence. What if you stole them, not you personally, but what if your client stole them directly and knew about it, would that make any difference? I think it would be very probative to the elements of whether the magazine exhibited good faith in this fair use. And there is a component of good faith in some of this. Yes, there is. Yes, there is. However, your time has expired by quite a lot, so thank you. Thank you, Your Honor. We'll give you one minute for rebuttal, even though your time has also expired. I have one minute, so I'll keep it brief. As to Judge Smith's question, the fact that they purchased these for value evidences the market, which goes to the fourth fair use factor. The Harper and Rowe standard for unpublished works is no more than necessary, and what I believe the evidence shows is that they used more than necessary here. You say you think that they did use more than was necessary? Absolutely. And that's determined based upon editorial expertise, your client's expertise, your expertise? I read Spanish. I look at these things and I think it all fits. It all works together. It's one seamless whole. You can see exactly what's going on. It makes a good story. And the fact that it came from the same photographs, same pictures, same camera and computer fits very nicely there. Does that make any difference? If I may, Your Honor, one of the captions of the photos is, then they went to a bar. I'm not sure how that evidences a wedding. She's wearing the wedding dress. He's wearing the same thing that he had on at the wedding. As Harper and Rowe points out, the copyright infringer cannot point to how much they did not take by showing their fair use when you're talking about the quantity and the quality. So when dealing with the issue of the over 400 photographs that Your Honor's brought up, yes, they can't say, oh, well, we only used five, so we didn't use that much. That's not what the Supreme Court said the standard is. Thank you. Thank you, Your Honor.
judges: Brewster, McKeown, Smith